**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **DON ROBINSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:10-cv-02087-JEO** |
| | ) | |
| **CITY OF HARTSELLE, ALABAMA, and** | ) | |
| **PATRICK GRIFFITH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

The above-entitled action has been brought by the plaintiff, Don Robinson (hereinafter

"Mr. Robinson"), to recover damages and other relief from the defendants, The City of Hartselle,

Alabama (hereinafter "the City") and Patrick Griffith (hereinafter "Officer Griffith"), premised

on injuries Mr. Robinson allegedly suffered during a traffic stop conducted by Officer Griffith of

the City of Hartselle Police Department.  (Doc. 1).  The parties have consented to the exercise of

jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c).  (Doc. 25).  It is before the court

on the following motions:

(1)     Motion to Dismiss by Officer Griffith, filed on October 27, 2010 (doc. 14), and

(2)     Motion to Dismiss by the City, filed on October 27, 2010 (doc. 16).

Both motions have been fully briefed and are now subject to the court's review.  Upon

consideration, the court finds that the motions are due to be granted.

**I.      FACTUAL AND PROCEDURAL HISTORY**

On November 13, 2008, Mr. Robinson was traveling in the passenger seat of a car driven

by his brother within the jurisdiction of the Hartselle Police Department.  (Doc. 11 (Amended

Complaint) ¶ 4).  Officer Griffith, an officer with the Hartselle Police Department, ordered Mr. Robinson's brother to pull the car to the side of the road by initiating his patrol car's blue lights. (*Id*. ¶ 5).  Mr. Robinson's brother turned the car into a driveway and stopped.  (*Id*.)  The Amended Complaint does not allege any facts pertaining to the reason for the traffic stop. Officer Griffith then ordered Mr. Robinson to get out of the car.  (*Id*. ¶ 6).

Mr. Robinson, who admits that he had been drinking, refused to get out of the car, telling Officer Griffith he was afraid he would be arrested for public intoxication.  (*Id*. ¶¶ 11-12). According to Mr. Robinson, Officer Griffith "opened the car door and attempted to force [Mr. Robinson] to get out of the car by inflicting pain."  (*Id*. ¶ 13).  Specifically, Officer Griffith took hold of Mr. Robinson's thumb and twisted in an effort to coerce Mr. Robinson out of the vehicle. (*Id*. ¶ 14).  Although "numerous" other unidentified officers from the Hartselle Police Department were also present, none attempted to intervene while Officer Griffith "increased the pressure on [Mr. Robinson's] thumb."  (*Id*. ¶¶ 15-18).

Mr. Robinson alleges that Officer Griffith persisted in this technique for "several minutes," with knowledge that he risked causing injury to Mr. Robinson.  (*Id*. ¶ 19).  According to Mr. Robinson, Officer Griffith disregarded his complaints of severe pain and continued to increase pressure on Mr. Robinson's thumb, until finally the thumb broke and several ligaments were torn.  (*Id*. ¶¶ 20-23).  The Amended Complaint does not indicate whether Mr. Robinson remained in the car at this time, or whether he stepped out of the car at any point as commanded by Officer Griffith.

The pleadings also fail to address any of the events that followed.  On July 30, 2010, Mr. Robinson filed a Complaint with this court in which he alleged that Officer Griffith violated his

Fourth and Fourteenth Amendment rights to be free from excessive force by a police officer. (Doc. 1, Count I).  The claims were brought pursuant to 42 U.S.C. § 1983.  (*Id*.)  Mr. Robinson also alleged that Officer Griffith and the officers who accompanied him should be liable for assault and battery and for negligence for failing to exercise a reasonable standard of care toward him during the traffic stop.  (*Id*., Counts II and III).

On October 26, 2010, Mr. Robinson amended his Complaint to eliminate his Fourteenth Amendment claim, and to clarify that the City should be liable to him for negligence based on the police officers' conduct because the officers were acting within the line and scope of their employment for the City.  (Doc. 13).  The following day, on October 27, 2010, Officer Griffith and the City filed separate Motions to Dismiss Mr. Robinson's claims in their entirety.  (Docs. 14, 16, respectively).  As previously stated, both motions have been fully briefed and are now ready for decision by the court.

## II.     STANDARD OF REVIEW

FED. R. CIV. P. 12(b)(1) provides for the dismissal of an action where the court finds that it does not have subject matter jurisdiction.  FED. R. CIV. P. 12(b)(6) provides for dismissal for failure of a party to state a claim for which relief can be granted.  Where "a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977).

### A.     Lack of Subject Matter Jurisdiction

A motion to dismiss for lack of subject matter jurisdiction should be granted "only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would

entitle plaintiff to relief." *Ramming*, 281 F.3d at 161.  Lack of subject matter jurisdiction may be found through an examination of: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts.  *See id.*  Because the burden of proof on a motion to dismiss for lack of subject matter jurisdiction is on the party asserting jurisdiction, the plaintiff "constantly bears the burden of proof that jurisdiction does in fact exist." *See Ramming*, 281 F.3d at 161, citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995), and *Menchaca v. Chrysler Credit Corp*, 613 F.2d 507, 511 (5th Cir. 1980).

### B.      Failure to State a Claim Upon Which Relief Can Be Granted

Dismissal for failure to state a claim upon which relief may be granted does not require appearance, beyond a doubt, that the plaintiff can prove no set of facts in support of claim that would entitle him to relief.  *Bell Atlantic v. Twombly,* 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), *abrogating Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).  Rather, a motion to dismiss under Rule 12(b)(6) should be granted if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 127 S.Ct. at 1964-65.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [ ] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  *Id.*, quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986).  However, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.*, 127 S. Ct. at 1969.  In deciding a Rule 12(b)(6) motion, the court "must accept all well-pleaded factual

allegations in the complaint as true and construe the facts in a light most favorable to the non-moving party. *Dacosta v. Nwachukwa,* 304 F.3d 1045, 1047 (11th Cir. 2002), citing *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir. 1998). "[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003), quoting *Marsh v. Butler County*, 268 F.3d 1014, 1036 n. 16 (11th Cir. 2001). Furthermore, "[a] complaint may not be dismissed because the Plaintiff's claims do not support the legal theory he relies upon since the court must determine if the allegations provide for relief on any possible theory." *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (emphasis in original), citing *Robertson v. Johnson,* 376 F.2d 43 (5th Cir. 1967). "The threshold of sufficiency that a complaint must meet to survive a Motion to Dismiss for failure to state a claim is . . . 'exceedingly low.'" *Ancata v. Prison Health Serv., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985), quoting *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev.*, 711 F.2d 989, 995 (11th Cir. 1983).

However, pleading standards increase in the Eleventh Circuit where a plaintiff asserts a claim under 42 U.S.C. § 1983, and a defendant raises his entitlement to qualified immunity. *See Amnest Int'l, USA v. Battle*, 559 F.3d 1170, 1179-80 (11th Cir. 2009). To satisfy this heightened pleading requirement, a plaintiff must plead only "'some factual detail' from which the court may determine whether the defendants' alleged actions violated a clearly established constitutional right." *Id*. at 1180. The Complaint should specify "what alleged rights were violated," "which of [the defendant's] actions allegedly violated those rights," and provide enough information for the court to determine "whether those rights were clearly established when the[] incidents occurred."

5

*Id*.

## III.    ANALYSIS

Mr. Robinson asserts three Counts in his Amended Complaint:  excessive force in violation of the Fourth Amendment, brought pursuant to 42 U.S.C. § 1983 (Count I); State law assault and battery (Count II); and negligence (Count III).

In his Motion to Dismiss, Officer Griffith argues that he is entitled to qualified immunity, and therefore need not defend Mr. Robinson's claim of excessive force under § 1983.  He argues further that, if the court agrees that he is entitled to qualified immunity on Mr. Robinson's § 1983 claim, the court should decline to exercise supplemental jurisdiction over Mr. Robinson's State law claims pursuant to 28 U.S.C. § 1367(a), and should dismiss Mr. Robinson's claims against him altogether.  The City, meanwhile, in its Motion to Dismiss, argues that if the court dismisses Mr. Robinson's claims against Officer Griffith, it should also dismiss Mr. Robinson's claims against it pursuant to § 1367(a).  Because the court's decision as to the City's Motion to Dismiss depends on whether it dismisses Mr. Robinson's claims against Officer Griffith, the court first addresses Officer Griffith's Motion to Dismiss.

### A.    Motion to Dismiss by Officer Griffith

Mr. Robinson's § 1983 claim hinges on whether Officer Griffith's use of the thumb twisting maneuver, as alleged in the Amended Complaint, constituted excessive force in violation of the Fourth Amendment.  *See Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989) ("Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be

secure in their persons ... against unreasonable ... seizures' of the person.").  Officer Griffith

maintains, however, that he should avoid defending this claim on grounds of qualified immunity.

### 1.        Qualified Immunity

The Supreme Court has explained that the doctrine of qualified immunity protects

government officials, including law enforcement officers, "from liability for civil damages[1]

insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.

Ct. 2727, 73 L. Ed. 2d 396 (1982).  Qualified immunity "reflect[s] an attempt to balance

competing values: not only the importance of a damages remedy to protect the rights of citizens

... but also 'the need to protect officials who are required to exercise their discretion and the

related public interest in encouraging the vigorous exercise of official authority.'"  *Id.*, (quoting

*Butz v. Economou,* 438 U.S. 478, 504-506, 98 S. Ct. 2894, 2909-2910, 57 L .Ed. 2d 895 (1978)).

To that end, "damages suits concerning constitutional violations need not proceed to trial, but can

be terminated on a properly supported motion for summary judgment based on the defense of

immunity[.]"  *Id.*  Consequently, "firm application of the Federal Rules of Civil Procedure will

ensure that federal officials are not harassed by frivolous lawsuits." *Id.* (quoting *Butz*, 438 U.S. at

507-508, 98 S. Ct. at 2911-2912).

Qualified immunity is "an *immunity from suit* rather than a mere defense to liability; and

like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."

---

[1]  In *Behrens v Pelletier*, the Supreme Court stated in *dicta* that qualified immunity does not preclude a
plaintiff from seeking injunctive relief against a public official under § 1983.  516 U.S. 299, 116 S. Ct. 834, 133 L.
Ed. 2d 773 (1996) (appellate courts have jurisdiction to hear interlocutory appeals of district court denial of qualified
immunity defense, both at Motion to Dismiss stage and summary judgment stage, so that Courts of Appeals may
consider appeal of denial of qualified immunity twice in the same litigation).  The court addresses this distinction as
it affects Mr. Robinson's claims in further detail *infra*.

*Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985) (emphasis in original).  Accordingly, "[w]here [a] defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."  *Saucier v. Katz*, 533 U.S. 194, 200-201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001), *overruled on other grounds*, *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).  *See also Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (*per curiam*) ("we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.").  A public official seeking the protection of qualified immunity must show "that he was acting within the scope of his discretionary authority at the time the allegedly wrongful acts occurred."  *Durruthy v. Pastor*, 351 F.3d 1080, 1087 (11th Cir. 2003).  In the present case, Mr. Robinson does not dispute that Officer Griffith was acting within the scope of his discretionary authority during all times relevant to this action.  "Once it is established that the defendant was acting within her discretionary authority, 'the burden shifts to the plaintiff to show that qualified immunity is not appropriate.'"  *Id*.

"In evaluating claims of qualified immunity, [courts in the Eleventh Circuit] apply the two-part *Saucier* test."  *Id*.  In *Saucier*, the Supreme Court instructed as follows:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry.  *Siegert v. Gilly*, 500 U.S. 226, 232, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991)....  If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.  This inquiry, it is vital to note, must be undertaken in light of the specific

context of the case, not as a broad general proposition[.]  [T]here is no doubt that
*Graham v. Connor*, [490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)], clearly
establishes the general proposition that use of force is contrary to the Fourth Amendment
if it is excessive under objective standards of reasonableness.  Yet that is not enough.
Rather, we emphasized in *Anderson* [*v. Creighton*, 483 U.S. 635, 107 S. Ct. 3034, 97L.
Ed. 2d 523 (1987)] "that the right the official is alleged to have violated must have been
'clearly established' in a more particularized, and hence more relevant, sense:  The
contours of the right must be sufficiently clear that a reasonable official would
understand that what he is doing violates that right."  483 U.S. at 640, 107 S. Ct. 3034.
The relevant, dispositive inquiry in determining whether a right is clearly established is
whether it would be clear to a reasonable officer that his conduct was unlawful in the
situation he confronted.  *See Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692, 143 L.
Ed. 2d 818 (1999) ("As we explained in *Anderson*, the right allegedly violated must be
defined at the appropriate level of specificity before a court can determine if it was
clearly established").

*Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156.  In *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct.

808, 818, 172 L. Ed. 2d 565 (2009), the Court explicated its holding in *Saucier* as allowing

courts to exercise their "sound discretion" in deciding which step of this inquiry should be

addressed first, "in light of the circumstances in the particular case at hand."

Turning to the present case, Officer Griffith argues that, even assuming the allegations in

the Amended Complaint are true, Mr. Robinson's claims against him should be dismissed on

grounds of qualified immunity.  Officer Griffith first points out that he acted within the bounds

of his authority when he stopped the car and ordered Mr. Robinson to exit the same.  In his

Amended Complaint, Mr. Robinson alleges that he was a passenger in a car that was driven by

his brother; that once his brother pulled the car off the road, Officer Griffith "ordered [Mr.

Robinson] to get out of the car"; that "[t]here was no basis for the order," and "[t]here was no

probable cause or reasonable suspicion to detain or arrest [Mr. Robinson]."  (Amended Compl.

(doc. 13) ¶¶ 5-8).  According to Officer Griffith, Mr. Robinson conspicuously fails to allege that

Officer Griffith lacked probable cause or reasonable suspicion to detain his brother, the driver of

the car.  As stated, none of the facts alleged in the Amended Complaint refer to the circumstances of the traffic stop.  Mr. Robinson also does not allege, even without supporting facts, that the stop itself was unlawful for any reason.  (*See* Doc. 13).  The only events of which Mr. Robinson complains concern Officer Griffith's conduct after the car was stopped.  Mr. Robinson concedes that Officer Griffith "arguably had a right to take [him] out of the car," but that Officer Griffith "chose to do so in a manner intended to cause [Mr. Robinson] severe pain and that he knew risked causing significant injury."  (Doc. 18 p. 2).

In *Pennsylvania v. Mimms*, the Supreme Court instructed that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."  434 U.S. 106, 111 n.6, 98 S. Ct. 330, 333 n.6, 54 L. Ed. 2d 331 (1977).  The Court extended that rule to passengers of lawfully-stopped motor vehicles in *Maryland v. Wilson*, 519 U.S. 408, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997).  The Court explained that "[w]e thought it 'too plain for argument' that [concern for the officer's safety] was 'both legitimate and weighty,'" *see Wilson*, 519 U.S. at 412, 117 S. Ct. at 885 (quoting *Mimms*, 434 U.S. at 109-110, 98 S. Ct. at 332-333).  *See also United States v. Aldridge*, 719 F.2d 368, 372 (11th Cir. 1983) ("Investigative detentions involving suspects in vehicles are especially dangerous to police officers") (citing *Mimms*, 434 U.S. 106, 98 S. Ct. 330, and *Adams v. Williams*, 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972)).  This concern is not outweighed by considering the intrusion into the driver's (or passenger's) liberty as "occasioned by the officer's ordering him out of the car," as such an intrusion is deemed *de minimis* where the vehicle has already been lawfully stopped.  *Wilson*, 519 U.S. at 412, 117 S. Ct. at 885.  In short, the principles that

10

underlie the Supreme Court's holding in *Mimms* that the driver of a lawfully-stopped vehicle may be ordered to step out of the car also apply to the passengers of such vehicles.  *Id*., 519 U.S. at 414, 117 S. Ct. at 886 ("[T]he possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.  And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.").  Indeed, "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car.  While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal."  *Id*.

The court, therefore, sustains Officer Griffith's argument that he lawfully stopped the car and ordered Mr. Robinson to step out of the same.  Mr. Robinson, however, contends that Officer Griffith's use of the thumb-twisting maneuver to coerce him out of the car constituted excessive force, because it was disproportionate to the range of force necessary to effect his command.  Mr. Robinson emphasizes that he posed no threat to Officer Griffith, he was not attempting to flee or otherwise resist arrest, and he had committed no crime.  Nevertheless, Mr. Robinson alleges, Officer Griffith "opened the car door and attempted to force [Mr. Robinson] to get out of the car by inflicting pain.  [Officer] Griffith grabbed [Mr. Robinson] by the thumb and twisted."  (*Id*. ¶¶ 12-14).

Assuming these allegations are true, however, the court does not find in them a sufficient basis to conclude that Officer Griffith's use of the thumb-twisting maneuver violated Mr. Robinson's constitutional rights.  As previously stated, Mr. Robinson concedes that Officer

Griffith "arguably had a right to take [him] out of the car."  Moreover, Mr. Robinson does not

dispute that he refused to leave the car, and expressly informed Officer Griffith that he so

refused.  (Amended Compl. ¶¶ 11-12).

> Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.  Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.  Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.  The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight....  With respect to a claim of excessive force ... not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-397, 109 S. Ct. at 1871-1872 (internal quotations and citations

omitted).

In the present case, it is undisputed that Officer Griffith asked Mr. Robinson to step out of

the car before he began to apply the thumb-twisting maneuver.  Mr. Robinson expressly refused

this command, and informed Officer Griffith that he would not step out of the car because he had

been drinking and feared being arrested for public intoxication.  At no point in the Amended

Complaint does Mr. Robinson allege that Officer Griffith continued to utilize the maneuver after

Mr. Robinson exited the car.  In *Ainsworth v. City of Tampa*, 2010 WL 2220247, * 6 (M.D. Fla.

June 2, 2010), the district court found under similar circumstances that the plaintiff's

"persistently resisting [the officer's] requests to exit the vehicle escalated the threat to [the officer's] safety and the risk of flight, or resort to some other evasion of arrest.  Thus, based on [the plaintiff's] non-compliance, a reasonable officer might have possessed a well-founded expectation of further resistance or flight."  The court in *Ainsworth* concluded that, premised on the existence of a fifteen-year-old arrest warrant for a person who shared the plaintiff's name, in addition to the plaintiff's repeated resistance to the officer's command to exit the vehicle, the officer's use of force to grab the plaintiff and throw him out of the vehicle onto a sidewalk -- causing severe injuries to the plaintiff that required multiple surgical repairs -- was "an amount of force calculated to remove [the plaintiff] from the vehicle and quickly place him in handcuffs, each of which is an allowable component of a lawful arrest."  *Id.*

The district court in *Ainsworth* relied on the Eleventh Circuit's decisions in *Nolin v. Isbell*, 207 F.3d 1253 (11th Cir. 2000), *Jones v. City of Dothan,* 121 F.3d 1456 (11th Cir. 1997), and *Post v. City of Fort Lauderdale*, 7 F.3d 1552 (11th Cir. 1993), in reaching the above conclusion.  In *Post*, the earliest of these cases decided after the Supreme Court's decision in *Graham*, *supra*, the Eleventh Circuit considered whether a police officer used excessive force in arresting a restaurant manager for a building code violation, when he "spun [the manager] around, placed him against a display case, applied a choke hold, and handcuffed him," while the manager was not actively resisting the arrest.  After the manager was placed in handcuffs, the officer told him to "shut up, you're under the control of the hatchet man for the commissioner now," then pushed the manager against a wall.  The court found that a reasonable arresting officer could have concluded that the force applied was necessary to prevent the manager from becoming violent, especially since the officer knew the manager had "violently" resisted arrest on

a previous occasion.  The court acknowledged that, once the manager was in handcuffs and taken outside, "no further force was needed"; however, though it may have been unnecessary to push the manager against a wall, "this pushing was not plainly unlawful."  Therefore, clearly established law did not indicate that the use of such force violated the Fourth Amendment.

The Eleventh Circuit relied on *Post* in deciding a similar claim in *Jones v. City of Dothan*, 121 F.3d 1456 (11th Cir. 1997) (*per curiam*).  Relying on its previous rationale in *Post* that "unless application of the [excessive force] standard would inevitably lead every reasonable [official] in [the officer's] position to conclude the force was unlawful," the court concluded that two officers who, after being told by the plaintiff that he had recently suffered a stroke, "slammed [the plaintiff] against the wall, kicked his legs apart, required him to raise his arms above his head, and pulled his wallet from his hands," used "minimal" force that, though unnecessary, was "minor in nature."  The court concluded that, "the application of the excessive force standard would not inevitably lead an official in [the defendants'] position to conclude that the force was unlawful."

In *Nolin*, the plaintiff brought claims of excessive force against an arresting officer pursuant to § 1983, after the officer observed the plaintiff wrestling with a friend.  The officer, believing the plaintiff and his friend were fighting, "grabbed [the plaintiff] from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him."  The court explained that "the application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."  In light of its prior decisions in *Post* and *Jones*, the Eleventh Circuit concluded that the police officer had

14

used *de minimis* force and was, therefore, entitled to qualified immunity.

In relying on *Nolin*, *Jones*, and *Post*, the district court in *Ainsworth* found that the force used to throw the plaintiff out of the car and onto a sidewalk -- after the plaintiff repeatedly refused to get out of the car -- was *de minimis* force and, therefore, violated no constitutional right. *Ainsworth*, 2010 WL 2220247 at *6. Similarly, this court does not find that Mr. Robinson's Fourth Amendment rights were violated when Officer Griffith used the thumb-twisting maneuver to force him out of the car as commanded. While it is not clear whether the degree of force imposed by Officer Griffith was necessary, as previously stated, Mr. Robinson does not allege that Officer Griffith continued to increase pressure on his thumb after he exited the car. Without alleging that Officer Griffith used the thumb-twisting maneuver even after Mr. Robinson complied with his order to step out of the car, the court cannot assume that the force exceeded that which was necessary to coerce Mr. Robinson to comply.

Turning to the second step of the *Saucier* two-step inquiry, the court also finds Officer Griffith's use of the thumb-twisting maneuver was not prohibited by clearly-established law as of November 13, 2008. Mr. Robinson has offered no case law which holds, or even implies, that the use of such a technique is unlawful. While it is not necessary for Mr. Robinson to point to case law that is directly on point, or even "materially similar"[2] to the facts of this case in order to satisfy this step of the inquiry, the Supreme Court has instructed that "the contours of the right [to be free from excessive force] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." In other words, "in light of pre-existing law the unlawfulness must be

---

[2] In *Anderson v. Creighton*, the Supreme Court reversed a decision of the Eleventh Circuit Court of Appeals that a plaintiff must present case law that is "materially similar" to the facts of the instant case to overcome a defendant's claim to qualified immunity. 483 U.S. 635, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*See also Saucier*, 533 U.S. at 201 (qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition.").

The cases cited by Mr. Robinson do not support his argument that clearly-established law prohibited Officer Griffith from using the thumb-twisting maneuver in this case. In *Lee v. Ferraro*, 284 F.3d (11th Cir. 2002), the Eleventh Circuit concluded that an officer was not entitled to qualified immunity based on the following allegations by the plaintiff:

> At approximately 6:00 p.m. on July 9, 1997, Lee, a twenty-nine year old African-American female, approximately 5' 7" tall and 160 pounds, was driving home on Biscayne Boulevard from her job as a paralegal in the City of Miami, a municipality within Miami-Dade County. While proceeding northbound in moderate to heavy traffic on a four-lane thoroughfare, Lee encountered a car stopped in her lane of travel, two or three car-lengths before the next traffic light. Officer Ferraro's police car was stopped in a travel lane next to the car on the passenger's side. Because the car in front of her did not move despite the light being green, Lee honked her horn for the car "to go with the flow of traffic," and the car proceeded. At this time, Ferraro yelled at her from his car, asking if she was with the passengers in the car that had been stopped. Lee shook her head, said no, and drove on. Ferraro then pulled his police cruiser behind her car and turned on his siren lights, so Lee pulled her car to the left side of the northbound lanes. She explained that she went to the left side because she was already in the left lane and could not "dart across" four lanes of traffic. After Lee had stopped her car, Ferraro motioned for her to pull her car into the parking lot of a gas station to her left, across the southbound lanes of traffic. Lee complied, and Ferraro parked directly behind her.
>
> Ferraro, a 6' 3", 190 pound male, came to the driver's side window and asked "what the hell was wrong" with her and "who the hell [she] thought [she] was," and, before Lee responded, asked for her driver's license. Lee started to reach down to get the bag containing her license, which was on the floor on the passenger's side of the front seat, asking Ferraro why he pulled her over. Ferraro responded that "he is the fucking boss around here, he asks all the questions, don't ask him questions, and things of that nature."
>
> Before Lee could reach her bag, Ferraro, who had not asked her to get out of the car, pulled the door open. He then took out his retractable night stick and "put it in [her] face." As he did this, according to Lee, "he was saying things to the effect that he should kick my black ass, he is the boss, he can-like just a whole lot of racial-just a lot of words pertaining to-black bitch." He called her "a fucking black bitch. He was saying he should kick my fucking ass. If I was a man, he would kick my ass. Things like that." While screaming these

words, Ferraro kept his night stick in Lee's face, and she remained seated in the car.

> Ferraro then "grabbed" Lee's left wrist and "just pulled [her] out" of the car. He pulled her with his hand still on her wrist, and then shoved her hand against her back. As he pulled her out of the car, he said, "You are under arrest." Once he had her outside the car, Ferraro "shoved" Lee against the car in front of the driver's side door. Asked if she was shoved "face first against the car," Lee responded "[r]ight, like chest." At this point, Lee explained, Ferraro "threw my hand on top of the hood and he frisked me, went through my pockets and things like that. After he was done with that, then he put the handcuffs on." Notably, she said that after the handcuffs were on and after she was secured, Ferraro "led me to the trunk of my car and slammed my head down onto the trunk and he kept spreading my legs with his foot." Lee did not resist Ferraro at any time during this incident.

*Lee*, 284 F.3d at 1190-1191. On these facts, the Eleventh Circuit concluded that the officer "used forced that was plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate under *Graham* [*v. Connor, supra*]." *Id*. at 1198.

These facts are plainly distinguishable from the those alleged by Mr. Robinson. On the facts asserted by the plaintiff in *Lee*, it is not even clear that the officer ordered the plaintiff to get out of the car before he grabbed her, pulled her out and shoved her against the side of the car. In the case at bar, Mr. Robinson admits that Officer Griffith first told him to get out of the car, and only initiated the use of force after Mr. Robinson expressly refused to comply with that order. The only other facts alleged in the Amended Complaint suggest that Officer Griffith continued to apply the thumb-twisting technique until Mr. Robinson's thumb broke. Whether Mr. Robinson remained seated inside the car, continuing to resist Officer Griffith's command throughout these events, is not even hinted at in the Amended Complaint.

*McCullough v. Antolini*, 559 F.3d 1201 (11th Cir. 2009), is even further distinguishable from the present case. In *McCullough*, the Eleventh Circuit held that sheriff's deputies were entitled to qualified immunity on the plaintiff's excessive force claim, after the plaintiff alleged that her

grandson was killed when he "disobeyed a police command and refused to pull his truck over, led the police on a high speed chase, and then after finally pulling over, refused to show his hands or respond to the deputy sheriff's orders and drove his truck in the direction of a sheriff deputy standing nearby." The court concluded that the plaintiff's grandson "posed a threat of serious harm or death to the officers, or other passersby, especially in light of the speed with which the incident unfolded ... [giving the officers] powerful reason to believe that the use of deadly force was necessary to prevent escape." *Id*. at 1208.

The remaining cases cited by Mr. Robinson also offer little support for his claim that the law clearly established that Officer Griffith's use of the thumb-twisting maneuver constituted excessive force. In *Secondo v. Campbell*, 327 Fed. Appx. 126 (11th Cir. 2009), the court found that, while plaintiff was arrested for "a relatively minor infraction and he did not resist arrest in any way," the arresting officer did not engage in excessive force when he placed handcuffs behind the plaintiff's back -- after the plaintiff told the officer he had had recent shoulder surgery -- and shoved plaintiff into a patrol car despite continuing complaints of severe pain by the plaintiff. In *Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir. 2008), an arresting officer was not entitled to qualified immunity after the plaintiff alleged the following facts:

> [W]hile high on cocaine, [the plaintiff] entered a Publix supermarket yelling, "Help me, help me, Jehovah God please help me!" and Defendants, upon arriving at the store, found [the plaintiff] running around and knocking items off of the shelves....
>
> According to his complaint, the Defendants "drew their guns and ordered [the plaintiff] to freeze. [The plaintiff] immediately complied and Defendants Gutierrez and Ortivero then proceeded to restrain [the plaintiff] by placing him in handcuffs behind his back ... without incident." While handcuffed and being led from the store, he again began asking for Jehovah's protection. "Defendants Gutierrez and Ortivero started punching [the plaintiff] in his stomach and face until he was beaten into a state of unconsciousness. While they were doing this the Defendants were yelling 'Shut up nigger' in response to [the

plaintiff's] plea for help from Jehovah God."

526 F.3d at 1327.  In *Reese v. Herbert*, 527 F.3d 1253 (11th Cir. 2008), the defendants grabbed the

plaintiff, "slung him against a wall in a choke hold, struck him, and then threw him to the ground."

527 F.3d at 1273.  Moments later, four police officers "piled on top of him and began kicking and

beating him.  One or more of the defendants continued twisting his arm behind his back despite his

repeated screams that they were breaking his arm."  Finally, after the plaintiff was handcuffed, an

officer lifted his head by the hair and sprayed pepper spray into the plaintiff's face at "close range."

*Id*.  The court concluded that the police officers lacked probable cause to arrest the plaintiff in the

first place, and therefore were not justified in using any force.  *Id*.

Similarly, the eight remaining cases cited by Mr. Robinson are distinguishable from the facts

of this case, such that none of them clearly established that Officer Griffith's use of the thumb-

twisting technique constituted excessive force.  *See Jennings v. Jones*, 499 F.3d 2 (1st Cir. 2007)

(factual dispute as to whether officer increased force after suspect stopped resisting); *Rodriguez v.

Farrell*, 280 F.3d 1341 (11th Cir. 2002) (arresting officer entitled to qualified immunity after

handcuffing plaintiff who had recently suffered a motorcycle injury; plaintiff's "earlier surgery made

what otherwise would be a common non-excessive handcuffing technique ... a maneuver that caused

severe injury and tragic results," including twenty-five surgeries and amputation of arm;

nevertheless, plaintiff offered no evidence that officer knew of surgery or that handcuffing plaintiff

would seriously aggravate his preexisting condition); *Smith v. Mattox*, 127 F.3d 1416 (11th Cir.

1997) (excessive force "readily apparent even without clarifying caselaw," where arresting officer

subdued resisting suspect, then broke the suspect's arm after the suspect had ceased all resistance);

*Slicker v. Jackson*, 215 F.3d 1225 (11th Cir. 2000) (officers not entitled to qualified immunity where

plaintiff was handcuffed before officers "kicked him in the ribs and beat his head on the ground [and] knocked him unconscious," while plaintiff did not offer resistance or attempt to flee); *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919 (11th Cir. 2000) (burglary suspect "submitted immediately" upon police arrival; arresting officer then ordered his dog to attack and bite the suspect, threatened to kill the suspect when the suspect resisted the dog's attack, and allowed the dog to attack the suspect "for at least two minutes"); *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002) (arresting officer not entitled to qualified immunity where, after placing plaintiff in handcuffs and into backseat of patrol car, engaged in verbal altercation with plaintiff during 4-mile drive to jail, stopped patrol car in a secluded area, got out of car and sprayed pepper spray into plaintiff's face, while plaintiff sat handcuffed in backseat); *Davis v. Williams*, 451 F.3d 759 (11th Cir. 2006) (arresting officer used excessive force when he grabbed plaintiff from behind while plaintiff was attempting to comply with officer's commands, pushed plaintiff to the ground, dragged plaintiff, "intentionally inflicted more pain when told that [plaintiff] had an injured shoulder and threw him forcibly into [a] dog cage in a canine unit, all while a compliant [plaintiff] was already in handcuffs"); *Walker v. City of Riviera Beach, Fla.*, 212 Fed. Appx. 835 (11th Cir. 2006) (officer not entitled to qualified immunity when officer hit plaintiff in the head with his gun, after plaintiff had pulled car over during traffic stop).

Having found each of these cases distinguishable from the facts alleged by Mr. Robinson, the court rejects Mr. Robinson's argument that clearly established law prohibited Officer Griffith from using the thumb-twisting maneuver. To the extent Mr. Robinson argues that Officer Griffith's conduct was "obviously unconstitutional even without a case," the court disagrees. To meet this standard, Mr. Robinson must allege that Officer Griffith's conduct was "so egregious that

20

preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable officer that what the defendant officer was doing must be 'unreasonable' within the meaning of the Fourth Amendment." *Rodriguez*, 280 F.3d at 1351 n.18.  The facts alleged in the Amended Complaint establish only that Mr. Robinson refused to get out of the car, despite Officer Griffith's lawful command that he do so, and after that refusal, that Officer Griffith applied continued pressure to Mr. Robinson's thumb until it broke.  Without even hinting that Mr. Robinson had ceased resisting prior to the break, the court finds no basis to conclude that the force applied was unnecessary, much less unlawful.

Accordingly, the court finds that Mr. Robinson has failed to carry his burden of establishing that Officer Griffith is not entitled to qualified immunity from his § 1983 excessive force claim.  Mr. Robinson, therefore, may not proceed on his claim for damages against Officer Griffith under § 1983.  To the extent Mr. Robinson seeks injunctive or other equitable relief from Officer Griffith for excessive force under § 1983, the court rejects such claims as Mr. Robinson has not persuaded the court that his claims in the Amended Complaint allege a violation of his constitutional rights.

Premised on these findings, the court concludes that Officer Griffith's Motion to Dismiss that claim is due to be granted.  Officer Griffith argues, however, that if the court dismisses Mr. Robinson's § 1983 claim against him, it should decline to exercise supplemental jurisdiction over Mr. Robinson's remaining State law claims against him pursuant to 28 U.S.C. § 1367(a).

28 U.S.C. § 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  District courts may,

21

however, in their discretion, choose not to exercise supplemental jurisdiction over such claims, particularly in cases where the federal claims over which the court exercised original jurisdiction have been dismissed.  *See* 28 U.S.C. § 1367(c).  Because this action remains in the pleading stage, discovery has not been initiated, nor has the court entered a Scheduling Order providing a timeline for the procedural development of this case.  Therefore, the court finds it appropriate to decline supplemental jurisdiction over Mr. Robinson's State law claims.  Premised on this finding, the court concludes that Officer Griffith's motion to dismiss these claims, as well as the City's Motion to Dismiss the single State law negligence claim against it, are due to be granted.

## IV.  CONCLUSION

Having found that Officer Griffith is entitled to qualified immunity on Mr. Robinson's claim for civil damages pursuant to § 1983, and that Mr. Robinson has failed to present a sufficient factual basis for equitable relief on this claim, the court concludes that Mr. Robinson's claim of excessive force in violation of the Fourth Amendment under § 1983 is due to be dismissed.  Therefore, Officer Griffith's Motion to Dismiss on that claim is due to be granted.  Because the court declines to exercise supplemental jurisdiction over Mr. Robinson's remaining State law claims against Officer Griffith and/or the City of Hartselle, the court finds that these claims are also due to be dismissed pursuant to 28 U.S.C. § 1367(c).

Accordingly, Officer Griffith's Motion to Dismiss Mr. Robinson's claims against him in their entirety is due to be granted.  The City's Motion to Dismiss Mr. Robinson's negligence claim against it is also due to be granted.  A separate Order will be entered.

**DONE** this 18th day of April, 2011.

**JOHN E. OTT**
United States Magistrate Judge